**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MARK ANTHONY DANIELS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 15 C 9148** |
| **v.** | ) | |
| | ) | **Magistrate Judge** |
| **CAROLYN W. COLVIN, Acting** | ) | **Michael T. Mason** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Michael T. Mason, United States Magistrate Judge:

Claimant, Mark Anthony Daniels ("Claimant"), has brought a motion for summary judgment [15] seeking judicial review of the final decision of the Commissioner of Social Security ("the Commissioner"). The Commissioner denied Claimant's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"). (R. 951-67.) The Commissioner filed a cross-motion for summary judgment, asking the court to uphold the decision of the Administrative Law Judge ("ALJ") [19]. The Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g) and 1383(c). For the reasons stated below, Claimant's motion for summary judgement is granted. The decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

## I. BACKGROUND

### A. Procedural History

On April 20, 2007, Claimant filed an application for DIB, alleging a disability onset date of February 12, 2007. (R. 141-48.) The claim was denied initially on August 29, 2007 (R. 76), and upon reconsideration on February 25, 2008. (R. 77.) On March 14, 2008, Claimant requested a hearing before an ALJ. (R. 96.) An administrative hearing was held on July 1, 2009. (R. 23-75.) Claimant, who was represented by counsel, appeared and testified. (*Id.*) A vocational expert ("VE") also appeared and testified. (*Id.*) On July 27, 2009, the ALJ issued a written decision denying Plaintiff's application for DIB benefits. (R. 7-18.) The Appeals Council denied review on July 16, 2010, leaving the ALJ's decision as the final decision of the Commissioner. (R. 1-5); *Estok v. Apfel*, 152 F.3d 636, 637 (7th Cir. 1998); 20 C.F.R. § 416.1481. On August 4, 2011, the U.S. District Court for the Northern District of Illinois granted Claimant's motion for summary judgment and remanded the action for further proceedings. *Daniels v. Astrue*, No. 10 C 5820, 2011 WL 3439269, at *1 (N.D. Ill. Aug. 4, 2011); (R. 645-70.)

On August 1, 2012, a second administrative hearing was held before an ALJ. (R. 533-73.) Claimant, who was represented by counsel, again appeared and testified. (*Id.*) A VE also appeared and testified. (*Id.*) On August 23, 2012, the ALJ denied Claimant's claim for DIB. (R. 512-26.) Claimant, again, sought judicial review, and the U.S. District Court for the Northern District of Illinois granted Claimant's motion for summary judgment and remanded the action for further proceedings. *Daniels v. Colvin*, No. 12 C 9317, 2014 WL 2158999, at *1 (N.D. Ill. May 23, 2014); (R. 1076-1107.)

On November 19, 2014, a third administrative hearing was held before an ALJ. (R. 975-1028.) Claimant, who was represented by counsel, appeared and testified. (*Id.*) A VE also appeared and testified. (*Id.*) For the third time, on December 9, 2014, the ALJ issued a written decision again denying Claimant's claim for DIB. (R. 951-67.) Claimant subsequently filed this action in the District Court.

### B. Medical Evidence

#### 1. Treating Physicians

##### i. Physical Health

On February 12, 2007, Claimant suffered a work-related injury when he was lifting heavy boxes and suddenly felt severe pain in his low back that radiated into both lower extremities. (R. 357.) Claimant subsequently stayed home from work and went to see Dr. Arti Chawla, of the Primary Care Physicians of Essington, one week later with complaints of difficulty moving his back and numbness and tingling in his back, left buttock, and right fourth fingertip. (R. 318.) Dr. Chawla ordered an MRI and instructed Claimant to take Vicodin as needed for pain. (*Id.*) The MRI was performed on February 23, 2007, and revealed "[s]ubtle disc space herniation, left L4–5, with foraminal narrowing." (R. 309.) Dr. Chawla referred Claimant to the Joliet Pain Care Center and requested that he see Dr. Hersonskey, neurosurgeon, thereafter. (R. 317.) Dr. Chawla also recommended that Claimant remain off work until he was seen at the Joliet Pain Care Center. (*Id.*)

On March 6, 2007, Claimant was seen by Aubrey Linder, PA-C, at the Joliet Pain Care Center, at which time he reported constant pain of a six out of ten. (R. 335.) The pain was mostly in the upper lumbar region, although he did have some weakness in his

left lower extremity and spasms in the lower lumbosacral region. (*Id.*) He described burning and numbness to the left posterior gluteal region and thigh. (*Id.*) Ms. Linder prescribed a short dose of steroids and a muscle relaxer and advised Claimant to stay off work until his follow-up appointment. (R. 336.) During his March 22, 2007 follow-up appointment, Claimant reported some mild lower lumbosacral back pain with occasional tingling; but he also noted that the muscle relaxer helped and that he was 80% improved. (R. 337.) Ms. Linder documented that the leg pain resolved, as did the numbness, tingling, and upper lumbar pain. (*Id.*) Ms. Linder discussed physical therapy, which Claimant was amenable to, and released Claimant to go back to work full-time on April 2, 2007 after he had a few physical therapy sessions. (*Id.*)

On April 12, 2007, Claimant was seen by Dr. Elton Dixon at the Joliet Pain Care Center. (R. 339.) Dr. Dixon documented that Claimant was unable to attend physical therapy and that he did not take pain medications because they upset his stomach. (*Id.*) Dr. Dixon recommended that Claimant should start transforaminal injections to manage his radiculopathy, use a Duragestic patch to manage stomach pains and ulcer, and to remain off work for 30 days while he started a therapy routine and the injections. (R. 340.)

On June 4, 2007, Dr. Joseph Hindo of the Primary Care Physicians of Essington, noted that Claimant was getting more depressed. (R. 319.) Dr. Hindo referred Claimant to a neurosurgeon, Dr. George DePhillips, and to Central Professional Group with the instruction to stay on Prozac until he was seen by a psychiatrist. (*Id.*) On July 2, 2007, Claimant began treatment for his back pain with Dr. DePhillips. (R. 357.) Based on his review of Claimant's February 2007 MRI scan, Dr. DePhillips opined that

the pain was related to disc injury at the L5–S1 level. (*Id.*) Dr. DePhillips recommended caudal epidural steroid injections and for Claimant to remain off work. (R. 357-58.)

On August 7, 2007, Claimant underwent another MRI scan, which revealed "[m]ild to moderate degenerative changes of the lumbar spine" and "overall ... similar [findings] to the previous MRI of 2/2007." (R. 370.) Claimant was seen by Dr. Faris Abusharif at the Pain Treatment Centers of Illinois on September 21, 2007 for a lumbar epidural steroid injection at the L4–L5. (R. 419-21.) At the appointment, Claimant reported weakness of the legs, poor balance, stomach pains, neck pain, back and leg pain, palpitations, depression, and anxiety. (R. 419.) The pain was described as a consistent eight out of ten and increased with most physical activity, sitting up and standing for long periods of time, cold weather, and walking. (*Id.*)

On September 26, 2007, Claimant returned to Dr. DePhillips for a follow-up evaluation. (R. 405.) Claimant reported that he experienced minimal pain relief after the first caudal epidural steroid injection and that he continued to experience lower back pain that radiated into the hips and buttocks. (*Id.*) Claimant rated his pain at an eight out of ten, and it was noted that prior to his back injury, his back pain was a two to three out of ten. (*Id.*) Dr. DePhillips scheduled another caudal epidural steroid injection and prescribed pain medication. (*Id.*) He told Claimant to remain off work and gave him a disability certificate until the next appointment. (*Id.;* R. 466.) The second and third epidural steroid injections were performed on October 11 and October 25, 2007. (R. 422-23.)

On October 29, 2007, Dr. DePhillips saw Claimant for a follow-up appointment. (R. 404.) The third caudal epidural steroid injection had provided no significant relief.

(R. 405.) Dr. DePhillips recommended that Claimant begin physical therapy three times per week for three weeks and referred Claimant to Dr. John Shea, a neurologist, for an independent medical examination. (R. 404.)

On October 31, 2007, Dr. Shea examined Claimant and reported that Claimant had pain in his low back that radiated down the left anterior and posterior thigh and knee, loss of strength in the left leg, and numbness in the left leg. (R. 453.) Spinal injections and chiropractic treatment did not help, however different pain medications had given him some help. (*Id.*) Dr. Shea added that Claimant could not walk very far and that sitting for more than 25 minutes and standing bothered him. (*Id.*) Claimant rated his pain at a six out of ten. (R. 454.) Dr. Shea concluded:

> Indeed, the patient could have suffered a back strain related to the work incident he described. I do not feel it caused any permanent neurological deficits. In essence, when I saw this patient he had loss of sensation to pinprick and vibration on the entire left side of the body which would be unrelated to any disc in the neck or the low back. He has normal reflexes with give-way weakness. He has no atrophy. I did not find any objective abnormalities. I do not believe he will need surgery… As far as his back is concerned, I do not feel he needs any further treatment. As far as his ability to undergo gainful employment, I recommend a Functional Capacities Evaluation (FCE).

(R. 455.)

On February 6, 2008, Claimant saw Dr. DePhillips for a follow-up evaluation. (R. 448.) Claimant continued to complain of lower back pain that radiated into both lower extremities and that failed to improve with conservative treatment. (*Id.*) Dr. DePhillips reviewed Dr. Shea's report, and made the following remarks:

> [Claimant] saw Dr. John Shea who felt that his symptoms were related to a lumbar sprain and that he requires no further medical treatment and certainly not surgical intervention. He felt that [Claimant] has reached maximum medical improvement. In light of the fact that [Claimant] has a history of a fusion at the L5–S1 level which appears to have been

> aggravated by the injury and in light of the fact that there may be other levels of internal disc disruption[,] L3–L4 and L4–L5, it seems ludicrous to attribute his pain to a muscle sprain which should have improved within 2–3 months of the accident.

(*Id.*)  Dr. DePhillips recommended a lumbar discography to pinpoint the source of the pain "and to confirm that [Claimant] has discogenic pain and mechanical instability that is the cause of his pain and that a stabilization procedure is a reasonable option."  (*Id.*)  He stated that Claimant was to remain off work until further evaluation and signed a disability certificate, verifying that Claimant was unable to work until further notice.  (R. 240, 465.)

At the next appointment with Dr. DePhillips on April 7, 2008, Claimant complained of worsening lower back pain over the past few weeks.  (R. 447.)  Dr. DePhillips prescribed two new pain medications and ordered a lumbar discogram to rule out discogenic pain and annular disruption.  (*Id.*)  Claimant had a follow-up appointment with Dr. Abusharif on April 21, 2008, at which time the plan for a lumbar discogram was discussed further.  (R. 424.)

Dr. DePhillips saw Claimant again on June 4, 2008, and observed that Claimant's pain had progressively worsened since his last visit despite the medications and was an eight out of ten.  (R. 445.)  A lumbar discogram performed on May 27, 2008 was reviewed and revealed concordant pain at L2–L3, L3–L4, and L4–L5, with annular tearing at L3–L4 and annular disruption at L4–L5.  (*Id.*)  The discogram, however, did not have a control level, and Dr. DePhillips explained that he would not consider it valid without one.  (*Id.*)  Therefore, Dr. DePhillips ordered Dr. Abusharif to inject the L1–L2 disc for testing.  (*Id.*)  The L1–L2 and L2–L3 lumbar discogram was performed on June

24, 2008, and revealed that L1–L2 was essentially normal but that L2–L3 "was a good produced concordant pain." (R. 468-69.)

At the next appointment on July 2, 2008, Dr. DePhillips noted that disc morphology was normal at L1–L2 and L2–L3 levels and recommended a second surgical opinion. (R. 443, 450.) On August 19, 2008, Dr. DePhillips found that Claimant continued to suffer worsening pain in the lower back that radiated into both lower extremities and ordered an MRI scan. (R. 441.) Dr. DePhillips recommended that Claimant remain off work and referred him for a second opinion regarding lumbar fusion surgery. (*Id.*)

Claimant next saw Dr. DePhillips on September 15, 2008 with continued complaints of worsening lower back pain radiating into the buttocks and down the posterolateral thighs and calves. (R. 438.) An MRI scan performed on September 8 revealed degenerative disc disease from L2–S1, primarily L3–L4 and L5–S1 levels, which Dr. DePhillips noted was not significantly different than the February 2007 study. (*Id.*) Dr. DePhillips wrote to Dr. Cary Templin for a second opinion regarding a multiple level spinal fusion potentially L2–S1 and explained that conservative treatment had failed to work. (R. 439.) A second opinion was ultimately obtained from Dr. Hurley, not Dr. Templin, on October 25, 2008. (R. 437.) Dr. Hurley opined that a 4 level fusion at L2–S1 would not be beneficial because the risks of surgery outweighed the benefits, and he did not believe that surgery would relieve Claimant's symptoms. (*Id.*) Dr. Hurley encouraged Claimant to consider other treatment modalities for the pain, including a spinal cord stimulator. (R. 865.)

During an appointment on October 29, 2008, Dr. DePhillips explained that he believed that it was reasonable to proceed with a spinal fusion "provided that [Claimant] has a reasonable expectation in terms of outcome and that there is a 50% chance that his symptoms will not improve or even worsen after the surgery;" however, Dr. DePhillips noted that he wanted a second opinion before proceeding with surgery. (R. 437.) Dr. DePhillips added that Claimant remained unemployable and disabled. (*Id.*)

On March 12, 2009, Claimant saw Dr. Alex Ghanayem, a spine surgeon. (R. 494.) After reviewing Claimant's MRI scans, discograms, and radiographs, Dr. Ghanayem opined that Claimant is not a good candidate for additional surgical intervention despite his discography results. (*Id.*) Instead, Dr. Ghanayem thought that Claimant should attend a chronic pain/comprehensive pain program to help manage his residual ongoing symptoms. (*Id.*) Dr. Ghanayem also noted that Claimant should remain off work in the interim. (*Id.*)

On August 17, 2009, Claimant was treated by Dr. John Kalec at the Pain Treatment Centers of Illinois, where he presented with significant low back pain radiating into both lower extremities, complete loss of normal lumbar lordosis, and hard lumbar paraspinal muscles. (R. 887.) Dr. Kalec refilled a pain prescription and documented that Claimant had both objective and subjective evidence of significant lumbar radiculopathy. (*Id.*) It was recommended that Claimant not return to work. (R. 889.)

Dr. Abusharif treated Claimant on October 19, 2009, and noted that while he would likely require surgical intervention, he was managing his pain with Dilaudid 8 mg daily. (R. 891.) On March 18, 2010, Dr. Ghanayem reassessed Claimant for surgery

and, again, found that surgery was not a good option because it would likely make the problem worse. (R. 899-900.) Claimant saw Dr. Kalec on April 19, 2010, at which time his Dilaudid prescription was refilled. (R. 892.) On May 26, 2010, Dr. Abusharif prescribed Neurontin 800 mg to treat the neuropathic component of Claimant's pain and documented that he was overall responding to pain medication. (R. 893.)

Dr. Abusharif next saw Claimant on July 26, 2010, and documented tender paraspinous muscles, tender facet joints, crepitus over left parathoracic muscles, tender right parathoracic, and painful lumbar muscles with flexion. (R. 859.) On August 30, 2010, Dr. Abusharif performed a lumbar transforaminal epidural steroid injection. (R. 861.) The injections provided little relief, and Dr. Abusharif recommended a trial spinal cord stimulator. (R. 862.)

On January 31, 2011, Claimant presented to Dr. Abusharif with low back pain on both sides, radiating to the bilateral leg and both feet, which he rated a nine out of ten. (R. 864.) Dr. Abusharif noted that surgery was not recommended by Dr. Hurley and began the necessary paperwork for a percutaneous trial of spinal cord stimulator. (R. 865.) On March 28, 2011, Claimant underwent a spinal cord stimulator presurgical psychological clearance evaluation. (R. 819.) Following the assessment, Dr. Peter Brown, pain psychologist, noted Claimant's "involved psychiatric history" and recommended that if a spinal cord stimulator trial proceeds, that it be a functional trial to better assess its effectiveness. (R. 816-818.) Dr. Brown identified the following risk factors: Claimant scored high or extremely high on the somatic complaints scale, functional complaints scale, muscular bracing scale, depression scale, and anxiety scale; and Claimant had the presence of a serious mental illness. (R. 817.)

The spinal cord stimulator was placed on May 16, 2011 for three days. (R. 866, 870.) A May 19, 2011 physical therapy follow-up evaluation did not show any significant changes with objective measurements with the exception of increased lower extremity strength. (R. 885.) On May 19, 2011, Dr. Brown saw Claimant, who reported a 20% improvement in his lower extremities and 15% improvement in lower back pain. (R. 815.) Nonetheless, Dr. Brown still recommended against a permanent implantation of a spinal cord stimulator given the risk factors he identified in his initial evaluation. (*Id.*) At a July 11, 2011 follow-up, Dr. Abusharif wrote that Claimant had a 20-25% reduction in pain during those three days, and the improvement was more noticeable after the device was removed and the pain resumed. (R. 870.) They discussed implantation of a permanent spinal cord stimulator, which required insurance authorization. (*Id.*)

Claimant continued follow-up evaluations with Dr. Abusharif. (R. 871-75.) On November 21, 2011 it was documented that insurance denied the request for a permanent implantation. (R. 876.) Dr. Abusharif also noted that there was no alternative treatment other than continuing with prescription management and that the doctor planned on appealing the decision. (R. 876-77.)

On December 29, 2011, Claimant underwent an examination by Dr. Matthew Ross at the Midwest Neurosurgery & Spine Specialists. (R. 929.) Dr. Ross found that Claimant had reached maximum medical improvement for his work injury and that it was not possible to completely alleviate his pain. (R. 930.) On March 5, 2012, Dr. Abusharif repeated Dr. Ross's findings and noted that Claimant's pain was an eight out of ten. (R. 925, 928.) Claimant continued treatment at the Pain Treatment Centers of Illinois

through July 16, 2012, where it was stated that his back pain persisted at a nine out of ten and his medications continued to be adjusted as necessary.  (R. 921-24.)

### ii.  Mental Health Treatment

Claimant underwent an initial psychiatric evaluation with Dr. Susan Sherman on June 7, 2007.  (R. 355.)  He presented with a history of depression and anger, and described feeling isolated at home while also not wanting to leave home because of his mood changes and anger.  (*Id.*)  Dr. Sherman documented an impression of "anxious, irritable, major depressive disorder" along with stress from not working and being in chronic pain.  (R. 356.)  She prescribed Effexor.  (*Id.*)  He was assigned a Global Assessment of Functioning ("GAF") score of 60, which indicates a moderate impairment in social or occupational functioning.  (*Id.*); *see Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed. text revision 2000).

On June 22, 2007, Dr. Sherman noted that Claimant was "feeling better on 75 mg Effexor, less anxious and irritable, yelling less at his family, getting out a little more[,]" and documented a slight improvement in his major depressive disorder.  (R. 398.)  She saw Claimant again on July 11, 2007 and increased his Effexor dosage.  (*Id.*)  Claimant was feeling better with the increased prescription on August 17, 2007, but Dr. Sherman found that there was some room for improvement.  (*Id.*)  On September 11, 2007, Claimant complained of persistent depression, irritability, and trouble sleeping.  (R. 397.)  Dr. Sherman documented major depressive disorder, adjustment disorder, and chronic pain.  (*Id.*)  On October 2, 2007, Dr. Sherman observed that Claimant was still agitated a lot.  (*Id.*)  On November 7, 2007 and December 10, 2007, Dr. Sherman indicated that Claimant's major depression disorder was in remission but recommended

that he continue taking his depression medication. (R. 396, 492.) On January 9, 2008, Dr. Sherman prescribed Lithium and Klonapin. (R. 240.) Dr. Sherman saw Claimant a number of times throughout 2008 and generally reported that he was doing well overall, with some moments of depression. (R. 489-91.)

Claimant was seen by Amanda Twait, NP, on October 6, 2008, at which time he reported feeling frustrated and discouraged about not being able to work; however Ms. Twait noted that there was no depression or despondency. (R. 489.) Effexor was effective, but it was too costly, and Cymbalta did not help his mood. (*Id.*) On December 9, 2008, Ms. Twait documented that Claimant was depressed and despondent about his physical and financial situation. (R. 488.) During appointments in early 2009, Claimant reported feeling isolated at home and very angry. (R. 486-87.) Ms. Twait saw Claimant regularly throughout 2009 and generally reported improvement in anger management and impulsivity. (R. 484-85.) Claimant, however, was still spending most of the day in his bedroom and away from family, which his wife stated had persisted for the past ten years. (*Id.*) Claimant continued to seek treatment regularly from Ms. Twait through 2012, during which time she monitored his medications and adjusted them as necessary. (R. 793-812, 934-42.)

### 2. Agency Consultants

On February 19, 2008, Dr. Barry Free, a state agency reviewing physician, opined that Claimant could lift and/or carry twenty pounds occasionally and ten pounds frequently, and that Claimant could stand and/or walk, as well as sit, for six hours in an eight-hour workday with normal breaks. (R. 408, 414.) Dr. Free also opined that Claimant could frequently balance, kneel, and crouch; occasionally climb ramps/stairs,

stoop, and crawl; and never climb ladders, ropes, or scaffolds. (R. 409.) In making these findings, Dr. Free referenced only the February 2007 MRI scan, Dr. Chawla's February 2007 notes, and progress reports at the Joliet Pain Care Center from March to April 2007. (R. 414.)

On May 14, 2012, James Balstrode, PT, completed a functional capacity evaluation. (R. 907.) The report stated that "a full duty return to work is not recommended at this time" and that Claimant's "demonstrated work tolerance is at the sedentary physical demand level for occasional lifting and frequent lifting/carrying, and at the light physical demand level for occasional carrying." (R. 908.) Specifically, Mr. Balstrode opined that Claimant could occasionally lift 15-20 pounds; occasionally carry 30 pounds; occasionally push 14 pounds; occasionally pull 17 pounds; occasionally bend, reach, climb stairs, squat, and kneel; and sit or stand/walk for zero to two hours at one time in seven to eight hours. (R. 909-10.)

### C. Claimant's Testimony

At the time of the November 19, 2014 hearing[1], Claimant was 56 years old. (R. 982.) He lived at home with his wife and 23 year-old son. (*Id.*) He has a GED. (R. 984.) Claimant had problems with drinking in the past, including two DUIs, but now only had a beer or two on Christmas or New Years. (*Id.*) He testified that he had no source of income. (*Id.*) He previously received workers' compensation from 2007 until 2012, but he did not know why it ended. (*Id.*) He disputed the end of his workers' compensation and ended up settling for $110,000. (R. 984-85.) Claimant explained that workers' compensation arranged a phone soliciting job for him, but he only lasted ten weeks because he did not obtain enough customer information. (R. 985.) He had

---

[1] Claimant also testified on July 1, 2009 and August 1, 2012.

to take frequent breaks and move around while working as a phone solicitor; and he explained that even though he was "not a phone person," he tried to do it.  (R. 986.)

The ALJ went through Claimant's job history, which included work as a warehouse forklift operator and making brake and throttle boxes for trains.  (R. 986-87.) Both jobs required him to lift over 80 pounds at times.  (R. 987.)  In 2007, he was working with trains when he was injured.  (R. 988-89.)  Claimant explained that since that time he has numbness in his legs and feet, shooting pain in his back, and depression because he is unable to provide for his family and his wife had to go back to work.  (R. 989.)  He also testified that every few weeks he might move wrong and end up hunched over.  (*Id.*)  When asked how long he could stand before being in too much pain back in 2007, he estimated ten minutes.  (*Id.*)  The pain has since worsened, however he now has pain medicine to help manage it.  (R. 990.)  He is not comfortable sitting and must continue moving to avoid numbness in his lower extremities.  (R. 990-91.)  Claimant testified that elevating his legs or laying in a fetal position helped somewhat.  (R. 991.)  In 2007, he could walk half of a block without needing to take a break.  (*Id.*)  Claimant also has had ulcerative colitis since 1976, which causes cramps, a frequent use of the bathroom, and increases his desire to stay at home.  (R. 992.) When he was working, he would be late or have to call in at least twice a week due to cramps and bladder accidents.  (R. 992-93.)

Claimant also testified that he has trouble making a fist and bending his fingers in his left hand.  (R. 997.)  When asked about his medications, Claimant explained that he was on nine medications at the beginning of the year, but is now taking four because some of them caused nausea.  (R. 998.)

In terms of household work, Claimant testified that he sometimes tries to help his wife with the laundry by moving it from the washer to the dryer.  (R. 993.)  He is able to make sandwiches or microwave meals.  (R. 993-94.)  He does not go shopping and only leaves the house when necessary.  (R. 994.)  Claimant can only sit in a car for a half hour before being in pain.  (*Id.*)  He explained that he has had anger issues since he was a kid that have since improved, but have not completely resolved.  (*Id.*; R. 995.)  He has been seeing a therapist since 2007 and was prescribed different medications for his depression and anger, but he still does not like leaving his house or being around people.  (R. 995, 999)

When asked about his interests prior to his accident, he testified that he was never an outgoing person but that he would go out with his family more.  (R. 1001.)  Following his accident, Claimant would go to the woods with a friend to sit by the water (which was 200 feet from the car) for up to an hour and a half, but he stopped going when his friend moved away in 2010.  (R. 1002, 1009.)  He explained that he can no longer do some of the things he loved, such as working on his motorcycle or landscaping.  (R. 1004.)  Back in 2007, he tried to cut the grass a few times and would occasionally float in his pool.  (R. 1005.)  He tried to continue Tai Chi after his accident, but was not able to because of the pain.  (R. 1010-11.)  Claimant mainly stays in his room and uses the computer, reads, listens to music, or watches television.  (R. 1006-07.)

### D.  Claimant's Wife's Testimony

Claimant's wife, Joella Daniels, also testified at the hearing.  (R. 1013.)  She explained that after her husband's 2007 injury, he was unable to walk at first, and then

was only able to walk a block occasionally. (R. 1016.) She stated that he became depressed, was easily angered, did not want to socialize, and had lowered self-esteem. (R. 1013-14.) Ms. Daniels testified that her husband would go out to the woods with his friend in 2007 to "[j]ust hang out" or listen to music. (*Id.*) Ms. Daniels further testified that her husband likes to minimize his situation and that he cannot lift as much as he thinks. (R. 1014.) Although he tries to help around the house when he can, he is often in pain afterwards and needs help from his wife and son. (R. 1015.) According to Ms. Daniels, Claimant's depression and reclusiveness have gotten worse. (R. 1017.)

### E. Vocational Expert's Testimony

Glee Ann Kehr, a vocational expert ("VE"), also testified at the hearing. (R. 1019-26.) The VE testified that she disagreed with the previous VE's testimony and classified Claimant's past work as most closely resembling an assembler of motor vehicles (unskilled, heavy as he performed it) and his work as a forklift operator as heavy as performed, and semi-skilled. (R. 1020.)

The ALJ first asked the VE to verify that a hypothetical individual with the same age, education, and past relevant work experience who could perform light work, with no climbing of ladders, ropes or scaffolding, occasional postural activities (including crouching, climbing stairs/ramps, kneeling, crawling, etc.), and with mental impairments resulting in mild restrictions in activities of daily living and moderate restrictions in social functioning (no public interaction, occasional interaction with co-workers, and simple and routine tasks) could not perform his past work. (R. 1021.) The VE confirmed that such a hypothetical person could not perform the past work; however, she opined that such an individual could perform the following light, unskilled positions: office helper (3,

700 positions in Chicago); mail clerk (3,800 positions in Chicago); and housekeeping work (5,400 positions in Chicago). (R. 1021-22.)

The ALJ next asked whether needing to change positions for five minutes at a time every 30 minutes while still on task would affect the job possibilities. (R. 1022.) The VE responded that it would not allow for the housekeeper job, but it would allow for work as a merchandise marker, of which there were approximately 2,600 positions in Chicago. (*Id.*) When asked whether a restriction to sedentary work would still allow for job opportunities, the VE testified that the following jobs would accommodate the restrictions: address clerk (2,900 in Chicago); account clerk (3,300 in Chicago); and bench sorter (3,000 in Chicago). (R. 1022-23.)

Additionally, while the Dictionary of Occupational Titles does not address absenteeism or off-task time, the VE used her own experience to estimate that the positions would allow for no more than one absence a month and off-task time not to exceed 15%. (R. 1023.) Claimant's attorney asked the VE whether training periods for the positions would involve more than occasional contact with co-workers, to which the VE explained that there would not be more than two hours of interaction with another person. (R.1024-25.) The VE was also asked whether limited use of the hands would affect the positions, and she explained that all sedentary work would be precluded. (R. 1025.) The VE further explained that occasional use of the hands coupled with occasional interaction with co-workers and no public interaction would preclude work. (*Id.*) Additionally, the VE testified that being off-task during the five minute sit/stand adjustment every thirty minutes would preclude work, as would outbursts where someone was threatened and missing weeks at a time for medical reasons. (R. 1026.)

**F. Prior District Court Remand Order**

On May 23, 2014, Judge Feinerman remanded Claimant's case to the Commissioner for further proceedings. *Daniels v. Colvin*, No. 12 C 9317, 2014 WL 2158999, at *1 (N.D. Ill. May 23, 2014); (R. 1076.) Specifically, Judge Feinerman found that the ALJ did not explain how Dr. DePhillips's assessments were inconsistent with his conclusions that Claimant was disabled; and, in fact, that several factors indicated that Dr. DePhillips's opinions should have been given substantial, if not controlling, weight. *Daniels*, 2014 WL 2158999, at *22, 24. Further, Judge Feinerman held that the ALJ's reliance upon the opinions of Dr. Free and Dr. Shea was inappropriate because the ALJ did not adequately address why those opinions were entitled to greater weight than Dr. DePhillips's. *Id.* at *27. Lastly, Judge Feinerman found that the ALJ had an insufficient basis to discredit Claimant's testimony and "should reassess [Claimant's] credibility in light of all of the evidence in the record." *Id.* at *30, 32. Judge Feinerman also held that the residual functional capacity ("RFC") determination would likely be affected once the ALJ reassesses the matter pursuant to the court's order. *Id.* at *32.

## II. LEGAL ANALYSIS

### A. Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater,* 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). We must consider

the entire administrative record, but will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003) (citing *Clifford v. Apfel,* 227 F.3d 863, 869 (7th Cir. 2000)). This Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez,* 336 F.3d at 539 (quoting *Steele,* 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," he "must build an accurate and logical bridge from the evidence to [his] conclusion." *Clifford,* 227 F.3d at 872. The ALJ must "sufficiently articulate [his] assessment of the evidence to assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (quoting *Stephens v. Heckler,* 766 F.2d 284, 287 (7th Cir. 1985)).

## B. Analysis under the Social Security Act

In order to qualify for disability insurance benefits or supplemental security income, a claimant must be "disabled" under the Social Security Act (the "Act"). A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's

impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). The claimant has the burden of establishing a disability at steps one through four. *Zurawski,* 245 F.3d at 885–86. If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

The ALJ followed this five-step analysis and ultimately found Claimant not disabled under the Act. (R. 966-67.) As an initial matter, the ALJ found that Claimant had met the insured status requirements of the Act through December 31, 2007.[2] (R. 956.) At step one, the ALJ found that Claimant had not engaged in substantial gainful activity during the period from his alleged onset date of February 12, 2007, through his date last insured of December 31, 2007. (*Id.*) At step two, the ALJ found that Claimant had the severe impairments of degenerative disc disease of the lumbar spine and depression. (*Id.*) At step three, the ALJ found that through the date last insured, Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). (R. 957.)

Before step four, the ALJ found that Claimant had the RFC to perform light work. (R. 959.) The ALJ also found that Claimant's RFC was further limited to work that allowed Claimant to change positions every thirty minutes for five minutes at a time;

---

[2] Because Claimant had acquired sufficient Social Security coverage to remain insured through December 31, 2007, he must establish disability on or before December 31, 2007 to be entitled to DIB. *See Shideler v. Astrue*, 688 F. 3d 306, 311 (7th Cir. 2012).

never climb ladders, ropes, or scaffolds; no more than occasionally climb stairs or ramps, balance, stoop, kneel, crouch, or crawl; and was limited to work that involved only simple instructions, routine tasks, no interaction with the public, and only occasional interaction with coworkers. (*Id.*) At step four, the ALJ found that through the date last insured, Claimant was unable to perform any of his past relevant work. (R. 964.) Finally, at step five, the ALJ found that there were jobs that existed in significant numbers in the national economy that Claimant could perform. (R. 965-66.) Specifically, the ALJ found that Claimant could work as an office helper, mailroom clerk, or merchandise marker; and in the alternative, if limited to sedentary work, Claimant could work as an address clerk, account clerk, or bench sorter. (*Id.*) Because of this determination, the ALJ found that Claimant was not disabled under the Act. (R. 966-67.) Thereafter, on August 11, 2015, the Appeals Court again declined to assume jurisdiction, leaving the ALJ's decision as the final decision of the Commissioner and, thus, reviewable by the District Court under 42 U.S.C. § 405(g). (R. 943-46.)

Claimant asserts that the ALJ made three errors. First, Claimant argues that the ALJ failed to conform to the mandates of the Court's prior remand order and thus, violated the *law of the case doctrine*. Second, Claimant argues that the ALJ's RFC assessment was not supported by substantial evidence. Lastly, Claimant argues that the ALJ failed to properly analyze his credibility. This Court agrees that the ALJ failed to follow the *law of the case doctrine* and failed to support Claimant's RFC assessment with substantial evidence.

## C.  The ALJ Violated the *Law of the Case Doctrine.*

Claimant asserts that the ALJ violated the *law of the case doctrine* because she failed to conform to the mandates of the Court's prior remand order with respect to the reassessment of Dr. DePhillips's opinion and with respect to Claimant's credibility.  In regard to the reassessment of Dr. DePhillips's opinion, Claimant contends that the ALJ violated the *law of the case doctrine* because the ALJ ignored this Court's instruction to evaluate Dr. DePhillips's opinions using the regulatory factors set forth in 20 C.F.R. § 404.1527(c).  The Commissioner responds that the ALJ assessed Dr. DePhillips's opinions according to the regulatory factors, reasonably denied giving Dr. DePhillips's opinion controlling weight, and properly assessed Claimant's credibility.

The *law of the case doctrine* dictates that "once an appellate court either expressly or by necessary implication decides an issue, the decision will be binding upon all subsequent proceedings in the same case."  *Key v. Sullivan*, 925 F.2d 1056, 1060 (7th Cir. 1991).  Therefore, the doctrine "requires the trial court to conform any further proceeding on remand to the principles set forth in the appellate opinion unless there is a compelling reason to depart."  *Law v. Medco Research, Inc.*, 113 F.3d 781, 783 (7th Cir. 1997).  The *law of the case doctrine* is applicable to judicial review of administrative decisions.  *Key*, 925 F.2d at 1060; *Chicago & Northwestern Transportation Co. v. United States*, 574 F.2d 926, 929–30 (7th Cir. 1978).  It requires the administrative agency, on remand from a court, to conform its further proceedings in the case to the principles set forth in the judicial decision, unless there is a compelling reason to depart.  *Wilder v. Apfel*, 153 F.3d 799, 803 (7th Cir. 1998).

Further, an ALJ must give controlling weight to a treating physician's opinion if the opinion is both "well-supported" and "not inconsistent with the other substantial evidence" in the case record. 20 C.F.R. § 416.927(c); *see Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). If the ALJ does not give the treating physician's opinion controlling weight, the ALJ cannot simply disregard it without further analysis. *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010). Instead, the ALJ must still determine what value the assessment does merit. 20 C.F.R. § 416.927 (c); *Scott*, 647 F.3d at 740; *Campbell*, 627 F.3d at 308. The regulations require the ALJ to consider a variety of factors, including: (1) the length, nature, and extent of the treatment relationship; (2) the frequency of examination; (3) the physician's specialty; (4) the types of tests performed; and (5) the consistency and support for the physician's opinion. *Campbell*, 627 F.3d at 308.

In the Court's most recent *Daniel's* decision, Judge Feinerman noted that while the ALJ suggested that some of Dr. DePhillips's assessments were inconsistent with his conclusion that Claimant was disabled, the ALJ did not explain how this is so. *Daniels*, 2014 WL 2158999, at *11. Judge Feinerman also noted that the ALJ's statement that Dr. DePhillips observed that Claimant had "decreased but symmetrical ankle reflexes and good motor strength" did not explain the relevance as it pertained to the consistency factor, or why it undermined the reliability of Dr. DePhillips's opinions. *Id.* at *23. In the ALJ's recent 2014 decision, the ALJ noted that she considered Dr. DePhillips's statements and did not give his opinion great weight. The ALJ opined that Dr. DePhillips's opinion was not consistent with his own treatment notes, other exams in the record, or the imaging in the record; however, the ALJ failed to adequately articulate

how Dr. DePhillips's treatment records were inconsistent with his opinion that Claimant was disabled.  Further, the ALJ failed to address the opinions of Drs. Hurley and Ghanayem in her 2014 decision, both of which were medical evidence consistent with Dr. DePhillips's opinion.  Both Drs. Hurley and Ghanayem credited Claimant's complaints of pain and recommended treatment such as medication and the implementation of a spinal cord stimulator; and the ALJ was required to address those opinions.  *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004); 20 C.F.R. § 404.1527(d).  An ALJ is required to evaluate every medical opinion in the record and may not ignore evidence that suggests an opposite conclusion.  *See Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014) citing *Whitney v. Schweiker,* 695 F.2d 784, 788 (7th Cir. 1982).  Thus, the ALJ again failed to articulate how Dr. DePhillips's opinion was inconsistent.

Next, Judge Feinerman found that Dr. DePhillips's opinions should be given substantial, if not controlling, weight because Dr. DePhillips had a treatment relationship with Claimant spanning more than one year and treated him every one to three months, unlike Dr. Shea and Dr. Free, who each saw him only once.  *Id.* at *24.  The ALJ took issue with Judge Feinerman's finding and opined that Dr. DePhillips did not examine Claimant during Claimant's second visit in September 2007 and that there was no indication that Dr. DePhillips examined Claimant during subsequent appointments in October 2007 or February 2008.  The ALJ determined Dr. DePhillips did examine Claimant in June 2008; and thus only examined him twice, while other visits merely involved documenting Claimant's subjective complaints and ordering/testing injections.

The ALJ's findings; however, are assumptions not grounded in fact and not supported by the record. *See Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 702 (7th Cir. 2009) (holding that determinations must be based on testimony and medical evidence in the record). It is well established that an ALJ has a duty to fully develop the record before drawing any conclusions. *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005). If the ALJ had a concern or questions about what exactly took place during Claimant's visits with Dr. DePhillips, she could have inquired and followed-up with Dr. DePhillips. More importantly, neither Dr. Shea nor Dr. Free were privy to Dr. DePhillips's October 2007 or 2008 treatment notes or the 2008 discograms, which reflected that Claimant had lower back pain. Thus, as Judge Feinerman found in the previous *Daniel's* decision, the length, nature, and extent of the treatment relationship favors Dr. DePhillips because Dr. DePhillips had a treatment relationship with Claimant spanning more than one year and treated him every one to three months, unlike Dr. Shea and Dr. Free, who each saw Claimant once.

Additionally, Claimant contends that with respect to credibility, the ALJ again relied on reasoning and facts that Judge Feinerman previously found to be insufficient as a matter of law. Specifically, Claimant argues that the ALJ's negative credibility finding regarding "conservative treatment" was found to be in error by Judge Feinerman. The Commissioner responds that the ALJ's citation of conservative treatment appears in the decision where the ALJ was discussing the nature of the treatment in conjunction with the RFC assessment, not the credibility determination. The Commissioner's argument is unpersuasive. As the Seventh Circuit has held, it is proper to read the ALJ's decision as a whole because it would be a needless formality to have the ALJ

repeat substantially similar factual analyses at both steps three and five. *See Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004). Therefore, the Commissioner cannot argue in one instance that an ALJ's opinion should be read as a whole and now argue that it should be read in sections, separate and distinct from one another.

Further, as Claimant contends, the ALJ's credibility findings in her 2014 decision are simply repetitions of her 2012 findings, with only the additions that the ALJ disagreed with the court. The ALJ's logic in 2014 closely mirrors the same faulty credibility logic as she used in her 2012 decision. The Court instructed the ALJ to reassess Claimant's credibility in light of all the evidence in the record; and the ALJ failed in this regard. Without a compelling reason, the ALJ was not at liberty to disagree with the Court and submit the same deficient credibility analysis. On its face, this is a violation of the *law of the case doctrine*, and as such is grounds for remand.

### D. The ALJ Failed to Support Her RFC Assessment with Substantial Evidence.

Claimant asserts that the ALJ's RFC assessment was not supported by substantial evidence because the ALJ failed to adequately explain the basis for her findings. Specifically, Claimant contends that the ALJ identified no basis for her finding that Claimant needed a sit/stand option in which he could change position every thirty minutes for five minutes at a time; nor did any treating or examining physician opine that changing positions would accommodate Claimant's pain at that defined interval, for an eight-hour workday, in the course of full time employment.

An RFC is an administrative assessment of what work-related activities an individual can perform despite her limitations. 96-8p; *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001); 20 C.F.R. § 404.1545. A claimant's RFC must be based

upon the medical evidence and other evidence in the record. *Dixon*, 270 F.3d at 1178.

When evaluating a claimant's RFC, the ALJ is required to include a narrative discussion

describing how the evidence supports each conclusion, citing specific medical facts.

SSR 96-8p; *Briscoe* ex rel. *Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

Here, this Court agrees that while the sit/stand option should have been included,

the ALJ provided no medical evidence or medical opinion that specified that Claimant

could stand/sit and change position every thirty minutes for five minutes at a time.

Neither the ALJ nor the Commissioner cited any physician opinion or medical evidence

in the record that supported the notion that the specified time interval would be

adequate to accommodate Claimant's back pain. Thus, the ALJ's RFC determination

was not supported by substantial evidence.

Next, Claimant contends that the ALJ ignored the existence and evidence of

Claimant's significant left hand impairment, and failed to consider Claimant's

impairments in combination. The Commissioner responds that if Claimant's left hand

impairment did not prevent him from performing his past work then it should not impede

his performance of the light work described in his RFC, and that it makes sense that the

ALJ would not discuss its effects either individually or in combination. The

Commissioner's arguments are once again unpersuasive. An ALJ must consider

whether a claimant's impairments meet or medically equal a listed impairment, either

singly or in combination. 20 C.F.R. § 405.1520(a)(4). In addition, a claimant's severe

and non-severe impairments must be considered in combination. SSR 96-8p; *Terry v.

Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). It is illogical to presume that because

Claimant was previously capable of working with an impaired left hand, he continued to

be capable of performing work despite his symptoms of back pain, anxiety, and depression worsening over time.

Further, during the November 19, 2014 administrative hearing, the VE testified that occasional hand use, together with the limitations to only occasional interaction with co-workers and no contact with the public, would preclude all work, at both the light and sedentary levels. (R. 1025.) The VE's testimony underscores the importance of considering a claimant's impairments in combination. Perhaps a person without depression, but with hand limitations and back pain could perform work, or a person without hand limitations, but with depression and back pain could perform work; however, all of those taken together may possibly preclude all work. In this case, Claimant is affected by his symptoms of depression, anxiety, back pain, and significant limitations in the use of his left hand. It appears from the VE's testimony that considering Claimant's impairments in combination may preclude Claimant from all work. Therefore, the ALJ erred when she did not consider Claimant's left hand impairment in combination with his other impairments, and failed to support her RFC finding with substantial evidence.

## V. CONCLUSION

Because this conclusion requires reversal on the basis the ALJ failed to follow the *law of the case doctrine* in regard to weighing Dr. DePhillips's opinions and Claimant's credibility, and the ALJ failed to support her RFC findings with substantial evidence, Claimant's remaining alleged RFC and credibility errors need not be addressed. The Court emphasizes that the Commissioner should not assume these issues were omitted from the opinion because no error was found. Indeed, the Court

admonishes the Commissioner that on remand, special care should be taken in completely re-evaluating the medical evidence of record, Claimant's RFC, and Claimant's credibility. Notably, the Social Security Administration (the "Administration") has recently updated its guidance about evaluating symptoms in disability claims. *See* SSR 16-3p, 2016 WL 1119029 (effective March 28, 2016). The new ruling eliminates the term "credibility" from the Administration's sub-regulatory policies to "clarify that subjective symptom evaluation is not an examination of the individual's character." *Id.* at *1. On remand, the ALJ should re-evaluate Plaintiff's subjective symptoms in light of SSR 16-3p.

For the foregoing reasons, Claimant Daniels's motion for summary judgment is granted and the Commissioner's cross-motion for summary judgment is denied. The Court finds that this matter should be remanded to the Commissioner for further proceedings consistent with this Order.

_____
Michael T. Mason
United States Magistrate Judge

**Dated: December 7, 2016**